## Case No. 11,796.

### The RICHMOND.

[1 Biss. 49.] [1]

District Court, N. D. Illinois. April, 1854.

SHIPPING—DELIVERY OF GOODS—USAGE—DUTY ON REFUSAL TO RECEIVE—SUBSEQUENT LIABILITY.

1. Long established, uniform, and well-known usage as to the mode of delivery by a common carrier, may be said to enter into the contract between the parties, and become the measure of their rights and liabilities.

[Cited in The Tybee, Case No. 14,304.]

[Cited in brief in Collender v. Dinsmore, 55 N. Y. 204.]

2. The usage being established that in the case of a consignment of goods to a particular person, the owner or shipper could not require the carrier to deliver the goods in different parcels, an offer by the carrier to deliver all the goods, within a reasonable time and in proper business hours, at whatever place the owner or shipper might direct, discharges the carrier from his extraordinary liability.

3. If the consignee then refuses to receive the goods, the carrier can take charge of them himself, or store them with some proper person, and he then becomes an ordinary bailee, and is required to use only ordinary care and diligence. There is a well known distinction between the liability of a common carrier, as such, and his liability after he has divested himself of that character.

4. The carrier, having made a proper offer to deliver the goods, which was refused, and hav-

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

ing then stored them in a warehouse which the next morning was burned, is not liable.

5. Where, after a proper offer to deliver, and a demand by the consignee that the goods should be delivered at different places, they were finally all landed together, the consignee insisting that the carrier should pay the drayage on the part which he wanted elsewhere, it seems that this was a delivery and acceptance, and the controversy was only as to payment of the drayage.

In admiralty. The libel in this case alleges that the libellant made a contract of affreightment with the captain of the schooner, by which the latter agreed, in August, 1851, to transport six tierces and one hundred and twelve hogsheads of sugar belonging to the libellant, of the value of eight thousand three hundred and thirty-nine dollars, from Buffalo to Chicago, and to deliver the same in good order to the libellant, dangers of navigation excepted; that the vessel did not deliver the sugar according to contract to the libellant at Chicago, but on the contrary, against the consent, request, and remonstrances of the libellant, landed fifty hogsheads of the sugar at the dock of E. H. Haddock, in Chicago, and that shortly after the warehouse connected with the dock was burned down, and the fifty hogsheads of sugar were thereby totally destroyed. The answer of the claimant admits the contract, but insists that the sugar was all delivered to the libellant at the wharf of E. H. Haddock, with his assent. It admits the warehouse was consumed, by which the sugar was destroyed, but declares that the fire was not the result of negligence on the part of any one. The answer further states that the captain of the vessel offered and was ready to deliver the sugar to the libellant at any place he might designate; that he requested the captain to deliver all the sugar, except about twenty casks, at the warehouse of A. T. Spencer & Co.; that after the vessel was ready to deliver the sugar at that warehouse, the libellant directed the sugar to be delivered at the dock of E. H. Haddock, and it was accordingly so delivered and received by the libellant; that the captain offered to deliver the entire consignment at any place the shipper might direct, but refused to divide it and deliver part at one place and part at another; that by universal and general custom the carrier could not be required to discharge a part of one consignment of goods, made to the same person, at different places in port.

The evidence shows that the vessel arrived in the port of Chicago on the 22d of August, 1851, and that the sugar was landed at the wharf of E. H. Haddock the next day, and that by nine o'clock on the evening of the 23d the sugar was all stored in the warehouse of Mr. Haddock, except a few casks (not the subject of controversy in this case), which were moved by the libellant to his own warehouse while the vessel was unloading. On the morning of the 24th of August the warehouse was destroyed by fire and the sugar lost. The warehouse was connected with the wharf. At the date of shipment and the delivery of the sugar at Chicago, the libellant occupied a warehouse on the wharf, on the margin of the river. No bill of lading was ever signed.

Grant Goodrich, for libellant.
H. F. Waite, for respondent.

DRUMMOND, District Judge. In the case of foreign vessels arriving in this country, it has been held that it is not necessary for the carrier to deliver the property shipped to the consignee personally, but to deliver it at the usual wharf, or at any proper place of landing, with reasonable notice to the consignee, will be sufficient. It is considered in such cases that the undertaking of the carrier is simply to convey from port to port. But this rule has been thought not to apply to the delivery in the coasting and internal trade of the country, but that in the absence of a special contract or well known usage to the contrary, the carrier is obliged to make an actual delivery. It has, however, been decided by some respectable courts that in the coasting trade it is sufficient to land the goods at any wharf or place generally used for that purpose, and give notice to the consignee, and that the carrier is not required to take them where the shipper may direct. It is certain, however, there are many cases in England and in this country which make a distinction between the foreign and inland trade, and which have adopted a much more stringent rule as to the delivery of goods by the carrier in the latter trade. Without examining how far there may be any sound reason for this distinction on principle, there can be no doubt that the usage or custom of a particular place or particular trade may, to some extent at least, reconcile the cases, because that is always an important element in determining whether the carrier has discharged his duty in the delivery of the property. Long established, uniform, and well known usage, as to the mode of delivery, may be said to enter into the contract between the parties, and becomes the measure of their rights and liabilities. Hence, different rules have sprung up, which the courts have sanctioned, between different kinds of carriage. Carriers by land are usually required to deliver the property to the owner personally or where he may direct. One class of carriers by land—railroads—do not generally send the property away from their depots. Carriers by water are not always required to make a personal delivery. The evidence clearly establishes this usage on the Lakes and in the port of Chicago. Where there is a consignment of goods to a particular person, the owner or shipper cannot require the carrier to deliver the goods in different parcels—in other words, the carrier may insist upon delivering the whole consignment at one place. This seems

to me to be a reasonable and proper usage, and one which the court ought to sustain. The testimony shows that in fact consignments have sometimes been divided by carriers, but most of these exceptional cases have stood upon some peculiar circumstances, and in all of them it appears to have been optional with the carrier. These cannot be said to affect the general custom. Whenever the shipper makes a special contract with the carrier as to the delivery of the goods, such contract would render the custom inoperative. In the absence of a special contract, I think it would require the clearest and most satisfactory proof of a well established and well known custom to divide consignments, to warrant the court in holding that it was the duty of the carrier to make such division on the claim of the shipper. It seems to me that if the carrier delivers or offers to deliver the goods to the consignee at one place, that is in law a good delivery, and discharges the carrier as carrier. There having been no bill of lading in this case, the rights and liabilities of the parties must depend upon the general principles of law applicable to such case.

It is not necessary to determine in this case whether a delivery at the usual wharf of the carrier (the libellant having one of his own), with notice thereof, is sufficient even in case of a usage to that effect, because the carrier here declares that he was ready to deliver the sugar at any place pointed out by the shipper, and that in fact the delivery was at the wharf of Mr. Haddock, with the consent of the shipper.

There is a well known distinction between the liability of a common carrier, acting as such, and his liability after he has divested himself of that character, though he may still have the custody of the property. In the latter instance, he is only held to the exercise of ordinary care and diligence. If the sugar were in the custody of the party actually or constructively, as a common carrier, he would, upon well settled principles, be liable for the loss in this case, though produced by an accidental fire. The question to be determined, then, is whether the connection of the owner of the vessel as a common carrier of the property had ceased, or was there a delivery of the sugar to the libellant.

The libellant paid the freight to the carrier, but as the payment was made on the 22d of August, while the sugar was yet in the vessel, and it was made before it was due, and was so understood by both parties, it cannot influence the question. Let us now ascertain what are the facts touching the delivery, as established by the evidence.

A witness in the employ of Mr. Dunham states that he was in the office of the libellant when the captain of the schooner came to ask where the sugar was to be delivered. The libellant said he wanted a part of the sugar—forty or fifty hogsheads—delivered at a storeroom on the river, adjoining his own warehouse. The remainder he wished to be delivered at a warehouse below, Spencer's, he thinks. The witness does not recollect that the captain made any reply or any objection. Another witness, who was in the employ of the libellant, declares that the libellant told him to go and say to the captain that he must deliver fifty or sixty hogsheads at his own dock. An officer of the schooner, whether captain or mate the witness did not know, refused to do it. The witness returned to the libellant, and the latter sent him back to forbid the captain to land the fifty or sixty hogsheads of sugar at Mr. Haddock's wharf, and to request him to bring them to his own dock. This the officer declined to do.

The captain testifies that he went to the libellant to ascertain where the sugar was to be landed. He said he would have it landed at Mr. Spencer's, with the exception of twenty or twenty-five hogsheads, which he wanted at his own dock. The captain replied that he would land the sugar at any one dock, but he would not deliver it round in different parcels. At this time the schooner was in the river abreast of the libellant's dock, and the captain said to him that if he wanted all the sugar delivered there, he was ready to deliver it. The libellant told the captain "to haul down to Spencer's, and he would see," and that the vessel would have to pay the drayage. After the schooner hauled down to Mr. Spencer's dock, it was ascertained that there was no room in his warehouse. The captain returned with the information to the libellant, who directed him to unload at the wharf of Mr. Haddock. This occurred on the morning of the day the sugar was landed. The captain had various interviews with the libellant, and in them all the latter objected to the unloading of the whole sugar at Haddock's, and insisted the vessel would have to pay the drayage on what he wanted at his own warehouse. There are several witnesses who confirm the captain's statement as to some facts touching the delivery. For instance, the libellant told different persons that he should require the vessel to pay the drayage on that part of the sugar which he wished landed at his warehouse, if it was unloaded at the warehouse of Mr. Haddock. Various reasons were given by the witnesses why the consignment could not be divided, but it is not necessary to advert to them. Mr. Dyer testifies that he was in Mr. Haddock's office when the libellant came in and requested Mr. Haddock to store some sugar for him. He thinks the quantity named was one hundred hogsheads or more—his impression is one hundred and twelve. The libellant left the office to ascertain where the sugar was to be stored. Mr. Haddock states he does not recollect the number of hogsheads which the libellant wished stored. While the vessel was unloading, a few of the casks burst open, and the libellant removed

the sugar which they contained to his own warehouse. There are a great many other details given by the witnesses connected with the delivery, but the foregoing may be said to be the pith of the testimony on that point, and I think there is great reason for saying that these facts make out a delivery of the goods at Mr. Haddock's dock, with the assent of the libellant; that notwithstanding he in words objected to landing a part of the sugar there, yet by his acts and conduct he acquiesced and accepted the whole, and that the controversy between the parties was narrowed down to a question as to who should pay for the drayage of the part the libellant desired to be delivered at his own wharf.

But I do not consider it necessary to place the decision exclusively on this ground. I go further and hold, if the libellant had never acquiesced in the delivery at Mr. Haddock's, the party would nevertheless have been discharged from his responsibility as a common carrier. If the captain offered, within a reasonable time and in proper hours of business, to deliver all the sugar at the libellant's dock, or wherever else he should direct—and this fact cannot be successfully controverted under the evidence—and the latter declined to receive it all there, or did not designate the place where it all was to be landed, then the carrier, in the absence of any uniform or well known usage to the contrary, upon landing the sugar at some suitable place, and giving notice to the consignee, was discharged from his extraordinary liability. In such case, if the consignee refuse to receive the property, the carrier can take charge of it himself, or store it with some proper person, and in either event the party becomes an ordinary bailee for the consignee or owner of the property, and is required to use only ordinary care and diligence concerning it—such care and diligence as a prudent man exercises over his own property.

If, then, the libellant had done and said nothing to manifest an acquiescence in the delivery at the wharf of Mr. Haddock, but had resisted it to the utmost, and, in fact, had declined to receive the goods, still the captain, having made an offer, under reasonable circumstances, to deliver them according to the direction of the shipper, and that offer being declined or not accepted, and the property actually delivered to a proper person, in a proper place, in no aspect can it be considered in the custody of the party as a common carrier. If the sugar was not in the possession of the libellant or his agent, it was in the possession, actually or constructively, of the carrier as a common bailee, and he was responsible only for the exercise of ordinary care; and it being conceded the fire was accidental in this case, the carrier is consequently not liable for the loss of the sugar or any part of it.

The libel must be dismissed, with costs.

NOTE. When a custom is so proved as to leave no doubt of its existence, it becomes a part of the law, and the court will so declare it, without requiring it to be again proved. Consequa v. Willings [Case No. 3,128]. The local usage of a particular foreign port will govern as to the time of delivery under a bill of lading. Higgins v. United States Mail Steamship Co. [Id. 6,469]; Broadwell v. Butler [Id. 1,910]. As to effect of custom and how established, see further 1 Bouv. Law Dict. p. 417. If consignee is not present to receive goods, they should be properly stored by the carrier. If stored in warehouse owned by carrier, his liability as common carrier ceases, and that of warehouseman commences. Chicago & A. R. Co. v. Scott, 42 Ill. 132. Under a bill of lading from a foreign port, the carrier is not bound to unlade at a place selected by the consignee. Vose v. Allen [Case No. 17,006]. He must unlade at a place which is good, safe, and proper, and a delivery there, with notice to the consignee, is sufficient. Id.

A carrier by water has a right to deliver the goods upon a wharf, at a proper hour, on a secular day, first giving due and reasonable notice to the consignee. Fisk v. Newton, 1 Denio, 45; Richardson v. Goddard, 23 How. [64 U. S.] 28; The Peytona [Case No. 11,058]; Howe v. The Lexington [Id. 6,767a]; Blossom v. Smith [Id. 1,565]; The Eddy, 5 Wall. [72 U. S.] 181. Redmond v. Liverpool, etc., Steamship Co., 56 Barb. 320. Contra, The Ville de Paris [Case No. 16,942]. See, also, Kennedy v. Dodge [Case No. 7,701]; Price v. Powell, 3 Comst. [3 N. Y.] 322; Salmon Falls Manuf'g Co. v. The Tangier [Case No. 12,266], and cases there cited by court and counsel. Where the goods are not accepted by the consignee or owner, the carrier discharges himself from liability on his contract of affreightment by storing them in a place of safety, and notifying the owner or consignee that they are so stored. The Eddy, 5 Wall. [72 U. S.] 481. When the articles to be transported have arrived at their destination, and have been received and stored in a warehouse, which is owned by the carrier or by some other party, the duty of the carrier is terminated. If the goods are stored in a building owned by the carrier, the liability changes to that of warehouseman. Porter v. Chicago & R. I. R. Co., 20 Ill. 407; Western Transp. Co. v. Newhall, 24 Ill. 466.

For a particular discussion of the termination of a carrier's risk, see Story, Bailm. § 538, and sequitur. The Mary Washington [Case No. 9,229]. Responsibility of carrier on Ohio river does not cease with landing upon the wharf and notice to consignee. Hemphill v. Chenie, 6 Watts & S. 62. For an extended discussion of the rights and duties of carrier and consignee, and particularly as to delivery, see Brittan v. Barnaby, 21 How. [62 U. S.] 527.

To constitute a good delivery upon a wharf, there must be reasonable notice to the consignee that the goods will be so unladen. A knowledge casually acquired by the consignee that the vessel has arrived and will discharge at a certain wharf will not dispense with notice. The Middlesex [Case No. 9,533]. Under an ordinary bill of lading, delivery on a wharf is sufficient, provided due notice be given to the consignee, and the different consignments are properly separated and open to inspection, and a fair opportunity is afforded the consignee to remove the goods. The Santee [Id. 12,328].